# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

IRONSHORE SPECIALTY INSURANCE
COMPANY,

      Plaintiff,

v.

DANIEL ULIBARRI,

      Defendant.

## IRONSHORE SPECIALTY INSURANCE COMPANY'S
## COMPLAINT FOR DECLARATORY JUDGMENT RELIEF

In accordance with 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, Plaintiff Ironshore Specialty Insurance Company ("**Ironshore**") by and through its undersigned counsel, Allen Law Firm, LLC, submits its Complaint for Declaratory Judgment Relief ("**Complaint**") against Defendant Daniel Ulibarri.  As grounds, Ironshore states as follows:

## PARTIES, JURISDICTION AND VENUE

1. Ironshore is a company organized under the laws of the State of Arizona with its principal place of business at 175 Berkeley Street, Boston, Massachusetts.

2. Daniel Ulibarri **("Ulibarri")** was at all times pertinent, a licensed and actively practicing attorney in New Mexico.  Upon information and belief, Ulibarri currently resides and practices law in Edinburg, Texas.

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

4. There exists diversity of citizenship between and among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Declaratory relief is authorized and appropriate in this action pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57.

6. An actual controversy exists between Ironshore and Ulibarri regarding Ironshore's duty to defend and/or indemnify Ulibarri against the claims asserted against him by Matthew Otero, Steve Otero, James Otero, Mark Otero, Rene Otero Haynes, Theresa Otero Weileman and Curtis Davenport (collectively "**Oteros**" or "**State Court Plaintiffs**") in the Thirteenth Judicial District Court in *Otero et al. v. Ulibarri*, No. D-1314-cv-2022-00425 ("**State Court Action**") pursuant to a policy of insurance issued by Ironshore to Liberty Mutual Insurance ("**Policy**") and whether Ulibarri was acting in the course and scope of his employment and as an employee of Liberty Mutual Insurance, as more fully identified and described herein.

7. The controversy is justiciable in character, and the relief requested herein is necessary to declare the parties' contractual rights, duties, and obligations under the Policy and applicable law.

8. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2), because the events giving rise to this controversy occurred in the State of New Mexico.

## GENERAL ALLEGATIONS

**A.    The Policy.**

9. Ironshore issued a policy to Liberty Mutual Holding Company, Inc. which covered Liberty Mutual Insurance Field Legal Counsel under certain, delineated circumstances. At the time of the events relevant to this claim, Ulibarri was employed by Liberty Mutual Insurance (**"LMI"**) as Field Legal Counsel.[1]

---

[1] LMI is a "law firm" within Liberty Mutual Group, Inc.'s corporate law division as provided in New Mexico's Rules of Professional Conduct 16-100, Terminology (defining "law firm" in part as lawyers employed in the "legal department of a corporation."). The attorneys in that office are LMI employees who only represent LMI's affiliates and their insureds, which has long been recognized as an appropriate practice

2

10. The Ironshore policy, No. DO7NABW885003, was in effect for the period of January 1, 2022, through January 1, 2023, policy period with a retroactive date of July 1, 1998. The Ironshore policy provides the following coverage, subject to applicable terms, conditions and exclusions.

11. The Ironshore policy provided the following coverage:

**I.   INSURING AGREEMENTS**

(A) The Company will pay on behalf of the Insured all sums that the Insured becomes legally obligated to pay as Damages and Claims Expenses resulting from Claims first made against the Insured during the Policy Period, or Extended Reporting Period, if applicable, as a result of a Wrongful Act by the Insured or any Entity for whom the Insured is legally liable, provided that:

(1) such Wrongful Act was committed on or after the Retroactive Date and before the end of the Policy Period;

and

(2) prior to the Knowledge Date stated in the Declarations of this Policy, the Insured did not know or could not have reasonably expected that such Wrongful Act might give rise to a Claim.

As a condition precedent to coverage, the Insured must report all Claims in writing to the Company as soon as practicable, but in no event later than sixty (60) days after expiration or termination of this Policy, or during the Extended Reporting Period, if applicable.

(B) The Insured shall not admit or assume liability for any Wrongful Act, or settle any Claim, or incur any expenses, including Claims Expenses, without the written consent of the Company. However, the Insured shall take all reasonable action within its ability to prevent or mitigate any Claim which would be covered under this Policy. The Company has the right to make such investigation and conduct negotiations and, with the written consent of the Insured, effect settlement of any Claim as the Company deems reasonable.

---

because of the insurance company's direct interest in the outcome of lawsuits filed against insureds. *See, e.g.*, Am. Bar. Assn. Formal Eth. Op. 03-430 (recognizing the validity of using insurance defense staff counsel to defend insureds and approving the use of a "law firm" type name for staff counsel offices when accompanied by disclosure to the insured of the attorney's employment relationship to the insurer).

>   If the Insured refuses to consent to a settlement recommended by the Company and elects to contest or continue to contest the Claim, the Company's liability will not exceed the amount for which the Company would have been liable for Damages and Claims Expenses if the Claim had been so settled when and as so recommended, and the Company will have the right to withdraw from the further defense of the Claim by tendering control of the defense thereof to the Insured. The operation of this paragraph is subject to the Limits of Liability and Deductible provisions of this Policy.
>
>   The Company is not required to pay any Damages and/or Claims Expenses, or to undertake or continue the defense of any Claim after the applicable limit of the Company's liability has been exhausted by payment of Damages and/or Claims Expenses or after deposit of the applicable limit of the Company's liability with or subject to control of a court of competent jurisdiction.

12. The Ironshore policy contains the following definitions relevant to this claim:

    ### III.  DEFINITIONS

    (A) **"Claim"** means receipt of a civil action, suit, proceeding or demand naming the Insured seeking Damages arising out of a Wrongful Act by the Insured or any Entity for whom the Insured is legally liable. A Claim will be deemed first made on the earliest date any Insured receives the civil action, suit, proceeding or demand.

    (B) **"Claims Expenses"** means:

    >   (1) Reasonable and necessary fees charged by an attorney(s) designated by the Company, or designated by the Insured with the Company's written consent, to defend a Claim and;
    >
    >   (2)  All other fees, costs and charges, resulting from the investigation, adjustment, defense, and appeal of a Claim, if incurred by the Company, or by the Insured with the Company's written consent, including premiums on appeal bonds, provided that the Company shall not be obligated to apply for or furnish such appeal bonds.
    >
    >   The determination by the Company as to the reasonableness of Claims Expenses shall be conclusive on the Insured.  Claims Expenses do not include salary charges, wages or  expenses of partners, principals, officers, directors, members or employees of either the Company or Insured, except attorneys and legal assistants employed by the Company who are participating in the investigation, settlement or defense of a Claim.

4

(C) **"Damages"** means a compensatory monetary amount for which the Insured may be held legally liable, including judgments (inclusive of any pre- or post-judgment interest), awards, or settlements negotiated with the approval of the Company.  Damages do not include any return, withdrawal or reduction of professional fees, profits or other charges, or fines, sanctions, taxes, penalties or awards deemed uninsurable pursuant to any applicable law.  Damages include punitive or exemplary damages or the multiple portions of any multiplied damage award unless such damages are uninsurable pursuant to applicable law.

*****

(F) **"Extended Reporting Period"** means the applicable period of time after the end of the Policy Period for reporting Claims arising out of Wrongful Acts committed or alleged to have been committed prior to the end of the Policy Period and on or subsequent to the Retroactive Date, and otherwise covered by this Policy.

*****

(H)  **"Insured"** means only the following:

(1) The Named Insured designated in Item 1.  of the Declarations, or by endorsement to this Policy;

(2) Any person who is, was, or hereafter becomes a partner, principal, officer, director, member, or employee of the Named Insured or a Subsidiary, but only while acting on behalf of the Named Insured or Subsidiary, and only to the extent the Named Insured agrees to provide professional liability insurance for that person;

(3)  The estate, heirs, executors, administrators, and legal representatives of an Insured in the event of such Insured's death, disability, incapacity, insolvency, or bankruptcy, but only to the extent such Insured would have otherwise been provided coverage under this Policy; and

(4) Any Subsidiary.

(I) **"Interrelated Wrongful Acts"** means Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

(J) **"Knowledge Date"** means the effective date of the first Miscellaneous Professional Liability Insurance Policy issued by the Company to the

Named Insured and continuously renewed and maintained in effect to the inception of this Policy Period.

*****

(M) **"Policy Period"** means the period specified in Item 2. of the Declarations, or any shorter period that may occur as a result of a cancellation of this Policy, and specifically excludes any Extended Reporting Period hereunder.

*****

(O) **"Professional Services"** means:

(1) Advising, inspecting, reporting or making recommendations pursuant to a contract to provide services for a monetary fee;
(2) Investigating, defending or settling any claim under any contract or treaty of insurance, self-insurance, reinsurance or suretyship;
(3) Auditing or maintaining accounts or records of others;
(4) Performing any claim, investigative, adjustment, engineering, inspection, consulting, survey, audit, appraisal, actuarial, data processing, benefits administration or other service for a monetary fee; and
(5) Legal services as an attorney.

However, except with respect to legal services as an attorney, Professional Services do not include services pursuant to, with respect to or incidental to any contract or treaty of insurance, reinsurance, surety, annuity or endowment issue by a Named Insured or Subsidiary.

*****

(R) **"Wrongful Act"** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty in the rendering of or failure to render Professional Services.

13. The Ironshore policy contains the following relevant exclusions:

**IV. EXCLUSIONS**

This Policy does not apply to and the Company shall not be liable for Damages and/or Claims Expenses resulting from any Claim made against an Insured:

(A) for, based upon, or arising from any actual dishonest, criminal, malicious or fraudulent act or omission by an Insured; however, this

Exclusion will not apply to Claims Expenses or the Company's duty to defend any such Claim unless or until a judgment or a final adjudication adverse to such Insured establishes the Insured committed such dishonest, fraudulent, criminal or malicious act or omission;

(B) by or on behalf of or with the assistance of any:

(1) Insured or

(2) Entity which at the time of the Wrongful Act or the time of the Claim or during the pendency of the Claim:

(a) is or was to any extent owned by or controlled by any Insured;

(b) to any extent owned or controlled any Insured;

(c) is or was affiliated with any Insured through any common ownership or control; or

(d) is or was acting with any Insured as a director, officer, partner, or principal stockholder.

For the purpose of this exclusion, a 10% or more owner of a publicly held corporation or a 30% or more owner of a privately held corporation will be deemed to control such Entity;

(C) for, based upon, or arising from any actual or alleged wrongful employment practices or any discrimination of any person or entity on any basis;

(D) by an employee, former employee or job applicant of the Insured in their capacity as such;

(E) for, based upon, or arising from any actual or alleged infringement of any patent, trade secrets, copyright, trademark, service mark, service name, trade dress, trade name, title or slogan;

(F) for, based upon, or arising from bodily injury, sickness, disease, emotional distress, mental anguish, outrage, humiliation or death;

(G) for, based upon, or arising from injury to or destruction of any tangible property including loss of use thereof;

(H) for, based upon, or arising from the gaining in fact of any profit, remuneration or advantage to which the Insured is not legally entitled;

7

*****

(M) Because of:

(1) Any obligation assumed by any insured; or

(2) The failure to discharge, or the improper discharge of, any obligation or duty, contractual or otherwise with respect to any contract or treaty of insurance, reinsurance, suretyship, annuity or endowment, including applications, receipts or binders, issued by any Named Insured or Subsidiary;

*****

(Q) Resulting from the rendering of, or failure to render, the following Professional Services:

(1) Advising, inspecting, reporting or making recommendations in the Insured's capacity as an insurance company or agent or representative thereof;

(2) Investigating, defending or settling any claim under any contract or treaty of insurance, reinsurance or suretyship;

(3) Auditing or maintaining accounts or records of others;

(4) Conducting an investment, loan or real estate department or operations; or

(5) Performing any claim, investigative, adjustment, engineering, inspection, consulting, survey, audit, appraisal, actuarial or data processing service for a fee. This exclusion (Q) does not apply to the rendering or failure to render: services for or on behalf of an insurance company that is not a Named Insured or Subsidiary; services pursuant to an agreement that is not a contract or treaty of insurance, reinsurance, surety, annuity or endowment; or legal services as an attorney while acting on behalf of the Named Insured or Subsidiary.

14. Under the Policy Conditions, the Insured is required to cooperate with all requests from LMI or Ironshore.

**(C) COOPERATION**

The Insured shall cooperate with the Company.  Upon the Company's request, the Insured shall submit to examination and interrogation by a representative of the Company, under oath if required, assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits, as well as in the giving of a written statement or statements to the Company's representatives and meeting with such representatives for the purpose of investigation and/or defense, and shall provide the Company with any available information and documentation relevant to any matter under investigation by the Company, without charge to the Company.

Additionally, upon the Company's request, the Insured shall attend hearings, depositions and trials relative to the defense of a Claim.

The Insured shall take such action as may be necessary to secure and effect any rights of indemnity, contribution or apportionment that the Insured and/or the Company may have.

**(D) LIMITS OF LIABILITY**

The Company's maximum liability for all Damages and Claims Expenses resulting from each Claim will be the Limit of Liability for each Claim set forth in Item 3. of the Declarations.  The Company's maximum aggregate liability for all Damages and Claims Expenses resulting from all Claims covered by this Policy will be the aggregate Limit of Liability for all Claims set forth in Item 3.  of the Declarations.

All Claims alleging, based upon, arising out of or attributable to the same Wrongful Act or Interrelated Wrongful Acts will be deemed to be a single Claim regardless of whether made against one or more than one Insured, and such Claim will be deemed to be first made on the date the earliest of such Claims is first made even if such date is before the Policy Period.  LD 00

All Claims arising out of the same Wrongful Act will be considered first made within the Policy Period in which the earliest of such Claims was first made or deemed to be made pursuant to Condition (A) of this Policy, and all such Claims will be subject to one such Limit of Liability as set forth in Item 3.  A of the Declarations.

The Limits of Liability of the Company for the Extended Reporting Period, if applicable, will be part of, and not in addition to, the Limits of Liability of the Company for the Policy Period.

Any payment of Damages and/or Claims Expenses by the Company will reduce the Limits of Liability.

9

> Claims made against more than one Insured under this Policy will not operate to increase the limit of the Company's liability.
>
> \*\*\*\*\*
>
> **(H) OTHER INSURANCE**
>
> If any Claim or Wrongful Act noticed to the Company under this Policy is insured by another valid policy or policies, then this Policy will apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy to the Policy Number indicated on this Policy's Declarations.

**B.** **The State Court Complaint**

15. On July 22, 2022, the Oteros filed their original lawsuit against Ulibarri, alleging that Ulibarri drafted a Last Will and Testament for Jimmie Otero, Jr. **("Will")**, and a Power of Attorney **("POA")** granting authority to Rosemary Montoya to act on behalf of Jimmie Otero, Jr. There is no allegation that Ulibarri acted within the course and scope of his employment with LMI. The July 22, 2022, Complaint alleged that Ulibarri drafted the Will and POA without ever meeting Jimmie Otero, Jr., and without ever communicating with Mr. Otero regarding his wishes for his Estate.

16. On July 26, 2022, the Oteros filed their First Amended Complaint.

17. On June 13, 2023, the Oteros filed their Second Amended Complaint for Negligence, Negligence *Per Se*, Fraud, Collusion and Damages (operative Complaint). *See* **Exhibit A**.

18. The Oteros seek to recover damages for the wrongful preparation of the Will and POA prepared by Ulibarri. *See,* **Exhibit A**.

19. According to the State Court Complaint, Jimmie Otero Jr. ("**Decedent**") died in Los Lunas, New Mexico, on July 17, 2018 at the age of 88. *Id.* at ¶ 5.

10

20. Decedent had eleven (11) children at the time of his death: Rose Mary Montoya, Jimmie Otero Jr., Susan Garcia, Steven Otero, Mona Lisa Davenport (now deceased), Rene Haynes, Matthew Otero, Mark Otero, Theresa Weileman, Leonard Otero (now deceased) and Abel Otero. *Id.* at 8.

21. All of Decedent's children, other than Rose Mary Montoya, Susan Garcia, Leonard Otero and Abel Otero are Plaintiffs in the State Court Action. *See* Complaint.

22. Upon information and belief, State Court Plaintiff Curtis Davenport is an heir and/or beneficiary of Mona Lisa Davenport's Estate. *Id.*

23. Ulibarri understood that Jimmie Otero, Jr. was suffering from physical and mental health issues at the time Ulibarri agreed to prepare the Will and POA. Despite his knowledge concerning Mr. Otero's condition, Ulibarri allegedly failed to make any inquiries into Mr. Otero's physical condition and did not request to be able to review relevant medical records. Likewise, Ulibarri allegedly failed to make any inquiries about Mr. Otero's mental status and whether he was competent to make and sign a Will. *Id.* at ¶¶ 16-18.

24. The Otero Complaint describes Mr. Otero's physical and mental health as continuing for approximately two (2) years before Mr. Otero's death. He was allegedly suffering from: "head injuries and confusion, including subdural hematomas shown on CT's and hospitalization[sic] due to falls, slow brain bleed, increased intracranial pressure or stroke, left ventricular hypertrophy on ECG, high blood pressure, diabetes type 1 uncontrolled and diabetes type 2 uncontrolled, hypoglycemic episodes, chronic kidney disease, chronic artery disease, poor vision with nuclear senile cataract, hearing impairment, digestive problems, low back pain and spinal stenosis with poor mobility, and other severe complications related to his advanced age." *Id.*, ¶ 22.

25. The Otero Complaint alleged that Mr. Otero was severely disabled during his last year of life and required constant care. *Id.*, ¶ 23.

26. The State Court Plaintiffs claim that Ulibarri colluded with Abel Otero and Rosemary Montoya prior to and during Ulibarri's representation of Jimmie Otero, Jr. and while preparing the Will and POA. *Id.*, ¶ 20.

27. The Complaint further alleges that Ulibarri colluded with Abel and Rosemary to keep the Will and POA a secret from the rest of the Otero siblings. *Id.*, ¶21.

28. For the last six months of Mr. Otero's life, Rosemary Montoya allegedly made all medical and financial decisions for Mr. Otero. She did not advise her siblings of her actions and did not disclose how she was using the money. *Id.*, ¶ 25.

29. On June 25, 2018, twenty two (22) days before his death, Jimmie Otero, Jr. allegedly signed the Will and POA prepared by Ulibarri. *Id.*, ¶ 26.

30. At the time he signed the Will and POA, he was incapacitated. *Id.*, ¶ 33.

31. The State Court Plaintiffs allege that the Will and POA were drafted by Ulibarri in collusion with Rose Mary Montoya and Abel Otero. *Id.*, ¶ 27.

32. The Will failed to identify Mr. Otero's other living children and the State Court Plaintiffs. *Id.*, ¶ 28.

33. The Will failed to list the names of Decedent's other children as being intentionally disinherited and Rose Mary Montoya is listed in the Will as the sole beneficiary of the residuary estate. *Id.*, ¶¶ 30-31.

**C.    Claims against Ulibarri**

34. The Otero Complaint sets forth claims for negligence *per se* (Section II), negligence and damages (Section III), and fraud, collusion and damages (Section IV). *See* **Exhibit A.** The

Otero Complaint asserts Ulibarri colluded with Rosemary and Abel to prepare the Will and POA, to obtain Mr. Otero's signature on the documents, and to assist in the filing of the Will with the Valencia County Probate Court on August 20, 2018, despite knowledge the Will was contested.

35. During the period from 2015 through 2019, Ulibarri was employed by LMI as Field Legal Counsel.

36. When Ulibarri began his employment with LMI he was required to sign an "Outside Practice Agreement." *See* **Exhibit B**. Per the Agreement, Ulibarri contractually agreed he would "not engage in the practice of law other than the work incident to [his] employment with the Company." *Id.*

37. Ulibarri also had to sign an annual Conflict-of-Interest and Compliance Certification. *See* **Exhibit C**. In each of these Certifications, Ulibarri reported to LMI that he had not performed any work outside work assigned by LMI.

38. Ulibarri failed to disclose the fact that he prepared a Will and POA for Jimmie Otero, Jr., despite his contractual agreement requiring him to advise LMI of such outside work. Further, Ulibarri was required to obtain written permission to handle the matter. Ulibarri failed to advise LMI at any time of the Otero Will and POA.

39. Ulibarri was deposed on March 29, 2021, concerning the drafting of the Will and POA. He did not notify LMI about the deposition or request representation during that matter.

40. Ironshore received first notice of this loss on or about September 1, 2022, after the Original Complaint was filed against Ulibarri.

41. Ironshore has agreed to provide a defense to Ulibarri pursuant to a Reservation of Rights while it seeks a declaration from this Court regarding its duties to Ulibarri under the Policy.

Ironshore has retained Butt Thornton & Baehr, P.C. to defend Ulibarri in the underlying action pursuant to a complete reservation of Ironshore's rights under the Policy and the law.

### FIRST CLAIM FOR RELIEF
**(Declaratory Judgment)**

42. Ironshore incorporates the allegations set forth in ¶¶ 1 through 41 of this Complaint as if fully set forth herein.

43. The rights, status, obligations and other legal relations of Ironshore and the Defendants are in dispute and are affected by the terms and conditions of the Ironshore policy and New Mexico case law. Specifically, a controversy has arisen as to whether Ulibarri may be considered an "Insured" under the terms, conditions and exclusions of the Ironshore policy.

44. There is no coverage under the professional liability coverage because the drafting of a Last Will and Testament and Power of Attorney by Ulibarri was not work performed in the course and scope of his employment with LMI. According to the Policy, Ulibarri may be considered an "insured" but ***only*** for acts within the scope of Ulibarri's employment by LMI. *See* Ironshore Policy, Section III, Definitions (H)(2):

> (2) Any person who is, was, or hereafter becomes a partner, principal, officer, director, member, or employee of the Named Insured or a Subsidiary, but only while acting on behalf of the Named Insured or Subsidiary, and only to the extent the Named Insured agrees to provide professional liability insurance for that person;

45. There is no coverage for the work performed by Ulibarri to prepare the Will and POA, as it is not work performed on behalf of LMI.

46. To the extent the underlying suit seeks to recover for damages arising from fraud or collusion, there is no coverage under the Ironshore policy for fraud and collusion, *See*, Ironshore Policy, Section IV, Exclusions (A).

47. To the extent the underlying suit seeks damages for bodily injury, outrage, or emotional distress, there is no coverage under the Ironshore policy for bodily injury, sickness, disease, emotional distress, mental anguish, outrage, humiliation or death. *See* Ironshore Policy, Section IV, Exclusions (F).

48. Accordingly, there is no duty on the part of Ironshore under the Policy to defend or indemnify Ulibarri for the claims brought against him in the Otero Lawsuit.

49. Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, Plaintiff Ironshore Specialty Insurance Company is entitled to:

    A.    Judgment declaring the rights and obligations of each of the parties regarding the disputes identified herein,

    B.    Judgment that there is no coverage under the Ironshore policy for the claims asserted against Ulibarri in the Otero Lawsuit,

    C.    Judgment that there is no duty to defend Ulibarri in this lawsuit under the Ironshore policy, and

    D.    Judgment that there is no duty to indemnify Ulibarri for the claims brought against him in the Otero Lawsuit.

50. **WHEREFORE**, Plaintiff Ironshore Specialty Insurance Company respectfully requests the Court grant the following relief:

    (1)    Enter judgment declaring the rights and obligations of each of the parties regarding the disputes identified herein,

    (2)    Enter judgment declaring there is no coverage under the Ironshore policy for Ulibarri for the claims asserted against him in the Otero Lawsuit,

    (3)    Enter judgment that Ironshore does not have a duty to defend Ulibarri in the Otero Lawsuit,

    (4)    Enter judgment that Ironshore does not have a duty to indemnify Ulibarri in the Otero Lawsuit for the claims brought against him,

    (5)    Award Ironshore its costs and attorney's fees, and

(6)     Award Ironshore such other and further relief as this Court deems just and proper under the circumstances.

Respectfully Submitted,

**ALLEN LAW FIRM, LLC**

*/s/ Meena H. Allen*
MEENA H. ALLEN
KERRI L. ALLENSWORTH
6121 Indian School Rd. NE, Suite 230
Albuquerque, NM 87110
(505) 298-9400
mallen@mallen-law.com
kallensworth@mallen-law.com

***Attorneys for Ironshore Specialty Insurance Company***