STATE OF NEW MEXICO

COUNTY OF VALENCIA

THIRTEENTH JUDICIAL DISTRICT COURT

CASE NO. D-1314-CV-2022-00425

MATTHEW OTERO, STEVE OTERO, JAMES OTERO,

MARK OTERO, AND CURTIS DAVENPORT,

                    Plaintiffs,

        vs

DANIEL P. ULIBARRI,

                    Defendant.


        VIDEOTAPED DEPOSITION OF DANIEL ULIBARRI
                    (Zoom)
                  MARCH 11, 2024
                  12:55 P.M.
                500 BECKER AVENUE
              BELEN, NEW MEXICO 87002



              PURSUANT TO THE NEW MEXICO RULES OF CIVIL
    PROCEDURE this deposition was:


    TAKEN BY:     TIBO CHAVEZ, JR., ESQ.
                  ATTORNEY FOR PLAINTIFFS




    REPORTED BY:  KIM KAY SHOLLENBARGER
                  NEW MEXICO CCR#236
                  VERITEXT LEGAL SOLUTIONS
                  500 4th STREET, NORTHWEST, SUITE 105
                  ALBUQUERQUE, NEW MEXICO 87102

                                          Page 1

**EXHIBIT B**

drafting the will for him to sign, right?

A. No, sir.

Q. Who was your client?

A. In the circumstance, in hindsight, I would say that Abel Otero would have had to have been my client, he was the only person whom I had contact.

Q. Did you have any agreement with Abel Otero with regard to him being your client?

A. Mr. Otero asked for assistance, I agreed to assist Mr. Otero as a friend, that was the extent of it. With regard to there being any further, a formal relationship as attorney and client, I explained to him, as in-house counsel I was not able to take private clients. That this would solely be a distinct matter preparing a document for his use.

Q. So does New Mexico, to your knowledge, have a requirement per the Supreme Court that attorneys inform their clients of the nature of their relationship when they are retained?

A. The nature of their relationship when they are retained, sure.

Q. How did you do that?

A. We were in a social setting. Abel mentioned that he needed assistance. I explained to him what I could do to assist and what I could not do because of my employment with Liberty Mutual.

Page 30

Q. Did you prepare or send a retainer letter of any kind to Abel Otero explaining that you were representing him?

A. No, sir, there was no retainer.

Q. Did you talk with Abel Otero about confidentiality?

A. In what sense, sir?

Q. In the sense that you discussed earlier when I asked you about attorney/client duties and that you discussed that an attorney has a duty of confidentiality to the client. Did you discuss that duty of confidentiality with Mr. Abel Otero?

A. I don't recall a specific conversation about that, no, sir.

Q. Was it important for you to maintain confidentiality about what you had discussed with Abel Otero?

A. The discussion happened at a social dinner in a public setting. Therefore, there was already limited confidentiality available.

Q. Was there a problem in the way you assessed it with regard to discussing with Abel, an attorney/client matter in a public setting where there was limited confidentiality available?

A. Well, my preference obviously is not to do that. We were at dinner, it was a social event, he asked for assistance as a friend and I told him what I could do to assist him as a friend, that was the size of it. There were no details discussed at that point in time with regard to

Page 31

property or what would or would not be in the will.

Q. Did you at that time discuss with Abel anything with regard to your duty not to create or take a matter involving a conflict?

A. Yes, sir, because we discussed my role with Liberty.

Q. Was there any other conflict that you discussed with him?

A. Not that I recall.

Q. Did you discuss with Abel at that time your affirmative duty to promote your client's interest?

MR. SANDERS: Objection, form.

A. I told him, as I recall, that I could assist him with preparing a set of documents that he would then be able to use with his father to finalize and do what his father wanted done.

Q. I'm understanding from your testimony that Abel is the person you understood to be your client and I am asking you what you did to promote your client's interest, the interest of Abel.

A. Yes. And his interest was to do what his father wanted done, that's what was represented to me.

Q. Did you discuss with Abel that you would be communicating as his attorney only with him?

A. I told him there would be specific information that I would be requesting from him, that information was then

Page 32

supplied by him. We didn't discuss the parameters of it needing to be he exclusively.

Q. What do you mean by that, that it wouldn't necessarily have to be Abel exclusively?

A. We didn't discuss that aspect of it, that I recall. I don't recall that I ever said to Abel, "you need to be the person who contacts me or you and I are going to discuss this specifically, exclusively," I don't recall that we said that.

Q. As far as it being a matter that was not exclusively between you and Abel, who else did you expect would be involved in the communications?

A. At that time at dinner I didn't know that anyone else would be involved. I anticipated it would just be Abel.

Q. You anticipated it would be who?

A. He, Abel.

Q. You said that there was a duty of research and preparedness. Did you discuss that duty with Abel?

A. No, sir.

Q. What did you understand your duty of research and preparedness with regard to Abe to be?

MR. SANDERS: Objection, form.

A. I understood that I was going to assist him with creating a draft that he would be able to present to his father for correction and changes necessary to effectuate what his father wished to have done.

Page 33

9 (Pages 30 - 33)

liability in this case, right?

A. Yes, sir.

Q. This is a policy that you provided to me that is for a different time period, right?

MR. SANDERS: Objection, form and foundation. Go ahead.

A. I believe, sir, it affords the same coverage.

Q. In item number 2, the time period is from January 1, 2022 to January 1, 2023. Are you telling me that that policy and that time period covers this incident?

MR. SANDERS: Objection, form and foundation.

A. Sir, I haven't read through the policy completely. So if it's a claims made policy form, then it would, in fact, be the one that would cover it, because the claim was made when suit was filed and that would put it in this time period. If it's not a claims made policy, it's an acts and occurrence policy, then we would need the 2018 form. But my understanding is that there is no difference. I haven't read the policy myself, though, so I can't tell you which it is.

Q. Does this policy cover the legal work that you did in drafting the power of attorney and the will for Jimmie Otero, Junior?

MR. SANDERS: Objection, form and foundation.

A. That is my understanding from Ironshore.

Q. What causes you to have that understanding?

Page 146

A. Because we requested the policy prior to and after litigation and this is the policy that was then provided in response to that specific request.

Q. What is the reason that Ironshore is contesting the applicability of this policy in federal court?

MR. SANDERS: Objection, form and foundation.

A. I have not read that entire Complaint either. My understanding is that there is an argument about whether this was within course and scope and therefore whether it would be covered by the policy at Liberty.

Q. Can you explain that more?

MR. SANDERS: Objection, form and foundation.

A. As we discussed in my prior deposition, I was in-house counsel with Liberty Mutual and so the question is whether this would fall within the ambit of work expected by the carrier or not.

Q. Were you ever told by anyone who was employed by Liberty Mutual that you were not allowed to moonlight?

MR. SANDERS: Objection, form.

A. What do you mean by moonlighting, sir?

Q. So working on matters that are not directly related to your duties with Liberty Mutual.

A. There was a specific ability to work on things outside of those matters assigned to you at Liberty, yes, sir.

Page 147

Q. Explain the facts of that, please.

A. There is a policy in place that stated that you were to disclose and address it and then it would be determined whether that work would be allowed or not.

Q. What did you do specifically with regard to disclosing and addressing the work that you did for Jimmie Otero?

A. Specific to Jimmie Otero, I did not disclose or discuss.

Q. Why did you not do that?

A. Because prior to doing the work for Jimmie Otero I had been approached by my sister with an employment matter and I had spoken with an AVP for the company, Patrick McDunna. Mr. McDunna informed me that as long as I was doing work for family or people I considered to be family and I was not being paid, that there was not an objection from Liberty Mutual and I did not need specific approval to do that work.

Q. Did you give any deposition or affidavit in the federal court case by Ironshore that addressed what you just said?

A. No, sir, it has yet to be raised in that case.

Q. Is it your intent to state those facts in the federal court case that's pending with regard to Ironshore attempting to exclude coverage for this case?

MR. SANDERS: Objection, form and foundation. I

Page 148

don't intend this to be a speaking objection. He does have coverage counsel, so I'm concerned that we're getting into a purview that he is represented by counsel on. It's getting a little uncomfortable about that line of questioning, because he is represented by counsel. He does have an active defense and it's important, frankly, that he don't say anything here today that could impact that defense.

Q. I'm understanding you have not been deposed in that federal court case.

A. I have not.

Q. Has there been a request to take your deposition?

A. Not of which I'm aware.

Q. Have you been served with interrogatories or requests for production in that case?

A. Not of as this time.

Q. The name of the person you said you had that discussion with, what was it, assistant vice president?

A. Yes, sir.

Q. What is the name of that person?

A. Patrick. He went by Rick McDunna. He's no longer with the company.

Q. Where was it that you had the discussion with him?

A. I was in Albuquerque. He was in Los Angeles, I believe. It was over the telephone.

Q. And you're saying that that conversation with your

Page 149

38 (Pages 146 - 149)