EXHIBIT C

# Transcript of the Testimony of

# Daniel Ulibarri

## October 15, 2024

## Ironshore Specialty Insurance v. Ulibarri

**Trambley's Court Reporting**
(505) 292-2120
strambley@windstream.net

Ironshore Specialty Insurance v. Ulibarri

Daniel Ulibarri
October 15, 2024

---

**10**

or power of attorneys and the like?

A. I did.

Q. Okay. Was that a big part of your practice or was that infrequently done?

A. It was infrequently done.

Q. Okay. During the time you were with Mr. O'Brien, either as an associate or a shareholder or as a named partner, how many times do you think you would have drafted wills, power of attorneys, and similar documents?

A. I couldn't be sure. 25, maybe 30 times.

Q. Okay. When you worked with Mr. McDonald, did you draft any probate documents, such as wills, power of attorneys or the like?

A. Not that I recall.

Q. And from there, you went to GEICO as GEICO's in-house counsel. Did I hear that right?

A. That's correct.

Q. And how long did you work for GEICO?

A. Approximately three years.

Q. And what type of work did you typically do at GEICO?

A. At GEICO, we typically did defense of automobile accidents.

Q. Did you do any type of probate matters while you worked at GEICO?

---

**11**

A. With the company's permission, I did assist with creating one probate estate, yes.

Q. And how did you obtain the company's permission to do that?

A. I spoke with my immediate supervisor.

Q. And who was your immediate supervisor there?

A. I don't remember the gentleman's name. It was David -- I don't recall. He was based in Dallas. He reported to the AVP.

Q. Did you have to sign any written documents when you took upon a probate matter?

A. I did not.

Q. And was that probate matter for a family member or a friend?

A. It was for a family member.

Q. And from GEICO, you went to Liberty as its field legal counsel; is that correct?

A. I don't recall that being the title, but I did go to Liberty, yes.

Q. What did you do at Liberty?

A. I don't recall what the title was. Kathryn Leonard referred to me as her senior in New Mexico.

Q. And I'm sorry, what was the name?

A. Kathryn Leonard.

Q. Kathryn Leonard, okay. And who was Kathryn

---

**12**

Leonard?

A. She was the resident attorney in Phoenix. She was my immediate supervisor.

Q. How long did you work at Liberty?

A. Approximately four-and-a-half, five years.

Q. I have your date of employment somewhere between 2015 to 2019. Does that sound right to you?

A. Approximately.

Q. Okay. During that 2015 to 2019 time frame, was Ms. Leonard your supervisor for the entire time?

A. She was not.

Q. Okay. When you started at Liberty, was Ms. Leonard your supervisor?

A. That is correct.

Q. And when did Ms. Leonard stop becoming your supervisor?

A. It was near the end. I left in '19, so it would have been November or December of '18 that we were moved to the RA in Denver, Suzana Skrabo, as our resident attorney to whom we answered, as I recall.

Q. Did Ms. Leonard leave Liberty to your knowledge?

A. Ms. Leonard was terminated, yes.

Q. At the time you worked at Liberty when Ms. Leonard was your supervisor, do you recall who the other attorneys were who worked with you at the time?

---

**13**

A. In New Mexico?

Q. Yes, in New Mexico.

A. At the time that I was hired, I was hired with a woman named Renee Mascarenas. Ms. Mascarenas and I worked together for a while, and then we hired Nick Rimmer. After Mr. Rimmer joined, Ms. Mascarenas left. We hired Julie Gallardo. Ms. Gallardo left. We hired Stanley Cassavant, and it was myself, Nick, and Stan at the time that I left in 2019.

Q. Did you work with anyone called Patrick McDonough?

A. Mr. McDonough was an AVP. He was Ms. Leonard's supervisor. He was also Ms. Skrabo's supervisor. So I worked a level under his supervision. He replaced a gentleman named Ian, whose last name I, again, don't recall, who was part of the hiring team that originally brought me on with Ms. Leonard.

Q. Do you keep in touch with Ms. Leonard at the present time?

A. Ms. Leonard and I speak periodically.

Q. Where is Ms. Leonard located?

A. As far as I knew, she's in Phoenix.

Q. When was the last time you spoke to Ms. Leonard?

A. Christmas.

Q. Do you know where she works?

A. I don't.

---

4 (Pages 10 to 13)

Ironshore Specialty Insurance v. Ulibarri

Daniel Ulibarri
October 15, 2024

**26**

primarily your e-mails or your messages, phone calls with Ms. Leonard were work related?
A. That is correct.
Q. Okay. Now, if you had to save either an e-mail or a message, was that incumbent upon you to save it to the file?
A. If I believed it was necessary, yes.
Q. Okay. And if you didn't believe it was necessary, would you delete that e-mail, for example?
A. No, I never deleted e-mail.
Q. Okay. Did you ever delete any messages or e-mails while you were at Liberty?
A. No.
Q. Did you ever send any text messages to Ms. Leonard?
A. Not on a Liberty device. I have texted Ms. Leonard on my own personal cell phone.
Q. Did you text Ms. Leonard on your personal cell phone while you were an employee at Liberty?
A. Yes.
Q. What is your cell phone number?
A. 505-350-0176.
Q. Was this the cell phone number you had during the 2015 to '19 time frame?
A. Yes.

**27**

Q. Who was your cell phone provider back during 2015 through 2019?
A. Sprint probably.
Q. Do you still have Sprint now, or did you change service providers?
A. Sprint bridged out. I think they're T-Mobile now.
Q. T-Mobile?
A. I believe.
Q. And is that who you have, T-Mobile, at the present time?
A. I believe.
Q. Are you the account holder?
A. I'm not sure whether that's been changed yet. Under Sprint, I had an employee account. Under T-Mobile, I believe I'm the account holder.
Q. Do you recall when it switched from Sprint to T-Mobile?
A. The merger was, what, 2020, I think. I had to get a new SIM card.
Q. Did you send any text messages to Mr. McDonough using your private cell phone between 2015 to 2019?
A. No.
Q. Okay. Did you ever send Mr. McDonough text messages using your private cell phone after 2019?
A. No.

**28**

Q. Do you recall how many times you conducted or participated in matters that were outside the scope of your employment at Liberty Mutual while you were an employee of Liberty Mutual between the 2015 to the 2019 time frame?
A. I'm sorry; I don't understand the question.
Q. Sure, and I'll rephrase it for you. Do you recall, during your employment at Liberty Mutual during the 2015 through the 2019 time frame, on how many occasions you performed outside work or work outside legal matters for Liberty Mutual? In other words, do -- how many times did you do work during the '15 to '19 time frame that was unrelated to your employment at Liberty Mutual?
MS. PULLEN: Objection; form.
Q. (BY MS. ALLEN) Did you understand the question?
A. So if I'm understanding the question properly, there were two things I worked on that were items not assigned to me by Liberty Mutual.
Q. And that's what I'm asking. How many times did you do work outside the Liberty Mutual-related work that you previously described doing various things under the underwriting companies that we talked about? That's what I want to know. So is it your recall that you did two assignments or two pieces of work unrelated to Liberty Mutual-related assignments?
MS. PULLEN: Objection to form.

**29**

A. There were two matters on which I worked that were not assigned to me by Liberty, correct.
Q. (BY MS. ALLEN) Okay. How would you get assigned Liberty Mutual-related work?
A. Via e-mail.
Q. Okay. And who would send you the e-mail?
A. Normally Kathryn Leonard.
Q. Okay. So if a new lawsuit comes in or a new assignment comes in to the Liberty office, Ms. Leonard, while she was your supervisor, would assign it out to attorneys, including you; is that correct?
A. That is correct in --
Q. And that's how you would -- I'm sorry; I didn't mean to cut you off. Go ahead.
A. For Utah, Arizona, and New Mexico, that's correct.
Q. And did you do any work in Utah?
A. No.
Q. Okay. Your work was limited to New Mexico-related matters; is that correct?
A. Correct.
Q. Okay. And you got your assignments from Ms. Leonard while Ms. Leonard was your supervisor?
A. Correct.
Q. And after Ms. Leonard left Liberty's employment, would you get your assignments from Ms. Skrabo?

8 (Pages 26 to 29)

30

A. Yes.

Q. Okay. All right. So going back to my original question, you did two things outside any work that was assigned to you by either Ms. Skrabo or Ms. Leonard during the 2015 to 2019 time frame?

A. Yes, I worked on two matters not assigned to me by Liberty, correct.

Q. Okay. What were those two matters?

A. I represented my sister in an employment matter with the State of New Mexico, and I crafted the will for Abel Otero that we are speaking about in the State suit today.

Q. What is your sister's name?

A. Elizabeth Jeanette Sandoval.

Q. Jeanette is J-E-N-E-T-T-E?

A. J-E-A-N-E-T-T-E.

Q. Okay. And the last name is Sandoval?

A. Correct.

Q. Okay. And when did you help your sister in the employment-related matter?

A. It started in 2016. By the time it was done -- well, it started in 2016. It ran through the time I was employed with Liberty.

Q. Is it still ongoing?

A. No.

31

Q. When did it complete or finish?

A. The ultimate end of it was in 2019.

Q. Were you still employed at Liberty when it was done?

A. No, I was with Ms. Rios by the time it finished.

Q. And what type of employment-related matter was it?

A. There was an adverse action taken by the State of New Mexico with regard to her employment, which she felt was unjust, and I assisted her with correcting that matter.

Q. Was litigation involved in that case?

A. To the extent that we were before the State personnel board and working under their rules, it was an administrative matter.

Q. When you started helping your sister in that matter in 2016, what, if anything, did you do to obtain permission from Liberty to engage in that activity?

MS. PULLEN: Objection to form, foundation.

Q. (BY MS. ALLEN) You can answer.

A. So when things began with my sister's circumstance, I had found her representation with another attorney. She was displeased with her representation. She had asked me if there wasn't some way I could assist her. I called Kathryn Leonard, and I asked Ms. Leonard if there was some way I would be allowed to do that work. Ms. Leonard said that there was a way that it could be permitted; that I

32

would need to speak with Mr. McDonough.

She gave me Mr. McDonough's number. I called Mr. McDonough. Mr. McDonough and I eventually spoke. Mr. McDonough assured me that under the policy, that as long as I was doing work for family or someone I considered to be family and I was not being paid, that that was not a problem and I was allowed to do that work. And so at that point, I took over my sister's employment matter and resolved that for her.

Q. And when did you have that conversation with Mr. McDonough?

A. In 2016, before I entered my sister's matter.

Q. Did you document that conversation and that permission in writing?

A. No.

Q. Why not?

A. I thought I could take Mr. McDonough at his word.

Q. Did you get paid by your sister?

A. No.

MS. PULLEN: Meena, I'm sorry; I know we are on a line of questioning here, but we have been going for an hour. I don't know how much more you want to ask on this line, but could we take a break soon?

MS. ALLEN: Sure. Give me one second. I'm going to finish this line of thought and then we'll take a break.

33

Q. (BY MS. ALLEN) When you represented your sister before the personnel board, how did you identify yourself to the personnel board? As an employee of Liberty Mutual or just Mr. Ulibarri, attorney at law?

MS. PULLEN: Objection to form.

Q. (BY MS. ALLEN) Do you understand the question?

A. I don't recall there being any references to Liberty in any of the documents or submissions in the matter before the State personnel board.

Q. Okay. And that -- I -- thank you for the answer. And that's what I was trying to get at, that when you -- I'm assuming you prepared written documents before the board; is that fair?

A. Yes.

Q. Okay. And in the -- in your signature block, you did not identify Liberty Mutual as part of your signature block in those documents that you submitted before the personnel board; is that correct?

A. I did not make any reference to Liberty that I recall.

Q. Okay. Thank you. All right.

MS. ALLEN: We can take a break. What do you-all want, five minutes, ten minutes?

MS. PULLEN: Five or ten minutes, yeah, that's fine.

9 (Pages 30 to 33)

Ironshore Specialty Insurance v. Ulibarri

Daniel Ulibarri
October 15, 2024

---

**34**

MS. ALLEN: Okay. It's 10:32. We'll come back at 10:42.

(Recess taken, 10:32 a.m. to 10:40 a.m.)

Q. (BY MS. ALLEN) Mr. Ulibarri, we've now had a chance to take a break. Is there any part of your prior deposition testimony that you wish to change, amend, or modify?

A. Not at this time.

Q. Okay. We were talking about your involvement in your sister's case between 2016 and '19, and I believe you testified that she didn't pay you for the work that you did for her; is that correct?

A. That is correct.

Q. Okay. Were there any legal fees involved in the sense of costs, et cetera, before the personnel board?

A. I had to drive to Santa Fe.

Q. But what about any costs involved, were there any filing fees or anything like that?

A. No, there are no fees to file with SPO. It's all done via e-mail with the administrative judge directly, so there are no fees for that. There isn't a fee for mediation. The mediators are trained and they are volunteers. And so, yeah, other than mileage, there -- there were not.

Q. Were you reimbursed for mileage?

---

**35**

A. No.

Q. Was there any expert fees involved?

A. No.

Q. The other matter that you did that was outside the scope of Liberty assignments was the Otero will and power of attorney; is that correct?

MS. PULLEN: Objection to form.

A. The other matter not assigned to me would have been for Abel Otero, correct.

Q. (BY MS. ALLEN) Okay. And that was work that you did that was outside the assignments provided to you by Liberty; is that correct?

A. That was work not assigned to me by Liberty, correct.

Q. Okay. Are you related to the Otero family?

A. Not of which I'm aware.

Q. Okay. I know there was the decedent, Jimmy Otero, Junior, right, and you are not related to him?

A. I don't believe so.

Q. Okay. How about Rosie Otero?

A. No.

Q. Okay. And my understanding is that Jimmy and Rosie had eleven children including Rose, Jimmy, Junior, Susan, Steven, Mona Lisa Davenport, Renee Haynes, Matthew, Mark, Theresa Wheelman (phonetic), Leonard and Abel Ch- --

---

**36**

and Abel. Were you related to any of them?

A. No.

Q. Okay.

A. Not of which I know.

Q. Okay. How did you come about being involved in preparing a will and power of attorney documents for the Otero family?

MS. PULLEN: Objection to form.

A. Abel Otero and his wife, Tara, and I and my husband socialized on a regular basis since I met my husband in 2012, and so I had known them for quite some time.

Q. (BY MS. ALLEN) What is Abel's wife's name again?

A. Tara.

Q. Can you spell that for me?

A. Now his ex-wife. T-A-R-A.

Q. Now ex-wife?

A. Correct.

Q. And was Tara's last name also Otero?

A. Yes.

Q. What is your husband's name?

A. Joel Carrete.

Q. You'll have to spell that for me.

A. J-O-E-L, C-A-R-R-E-T-E.

Q. Carrete, okay. Thank you. Okay. So Abel, Tara, Joel, and you socialized on a regular basis since 2012, but

---

**37**

how did this preparation of a will come about?

A. One evening at dinner, Abel had asked whether I could assist him with preparing the documents, and so we got to talking about what information would be necessary to assist him with that process and then we went from there. That's how it came about.

Q. When did you have that discussion at dinner? Do you remember the month or the year?

A. It would have been in 2018. It was either May or June. It was very close in time to the time I understand it was ultimately executed.

Q. Were you paid for preparing the will?

A. No.

Q. What documents were you asked to prepare?

A. A will and durable power of attorney.

Q. What made you decide to do the will and the durable power of attorney as opposed to referring Abel Otero out to another lawyer?

A. Abel and Tara were very, very close personal friends. Abel, when -- Abel and Joel had worked together many years previously and had been in contact for years. Abel had invited Joel to be part of his wedding. Abel literally broke down into tears when he found out that we weren't going to have a wedding party and then went and got ordained so that he could perform our ceremony for us in

---

10 (Pages 34 to 37)

EXHIBIT C

Ironshore Specialty Insurance v. Ulibarri

Daniel Ulibarri
October 15, 2024

---

42

again.

MS. ALLEN: Sure. I don't know that I can phrase them the same way that I did.

Q. (BY MS. ALLEN) Mr. Ulibarri, I believe I had asked besides speaking to Tara and Abel Otero, did you speak to the decedent, Jimmy Otero, Junior, prior to preparing the will and the durable power of attorney?

A. I did not.

Q. Okay. Did you speak to anybody else besides Tara and Abel Otero prior to you preparing the will and the durable power of attorney?

A. I did not.

Q. Okay. What was the time frame between the discussion you had with Abel and Tara about preparing these documents and you actually sitting down and preparing the documents?

A. I don't understand.

Q. Sure. From the time you had the discussion at dinner with Tara and Abel about putting together a will and a durable power of attorney, and the time that you actually did them, do you recall that time frame? Was it days, weeks, months?

A. It would have been approximately a week.

Q. Okay.

A. We had dinner one weekend and I believe we spoke

---

43

on the phone the following weekend, and I e-mailed them. That's my recollection.

Q. Understood. After you e-mailed the documents to -- I believe you said Tara Otero; am I correct?

A. That's correct.

Q. How long did it take for the documents to be returned back to you?

A. The documents were never returned to me.

Q. Okay. Do you know what happened after you sent the documents to Tara Otero?

A. Did I then or do I now?

Q. Then.

A. No.

Q. Okay. What do you -- what did you understand happened after you e-mailed the documents to Tara Otero?

A. What did I understand was going to happen?

Q. No, let me rephrase the question for you. At the time you prepared the documents and e-mailed them to Tara, was it your understanding that Tara and Abel would get them to Mr. Otero, Junior, for his execution?

MS. PULLEN: Objection to form and line of questioning. Meena, I believe we're getting into that same area of the underlying case. And without Mr. Sanders present, I'm not really comfortable having you ask these kinds of questions.

---

44

MS. ALLEN: Okay. I understand the objection, but it goes to -- and I'm trying to be very careful limiting my questions to the declaratory judgment action because I'm looking for time frames here. So let me see if I can rephrase the question without drawing an objection, Mr. Ulibarri.

Q. (BY MS. ALLEN) Did you hear back from either Abel or Tara Otero after you provided those documents that you just spoke about to them via e-mail?

A. With regard to the documents?

Q. Yes, sir, just the documents.

A. No, I -- I never heard about the documents again until suit was filed.

Q. Okay. All right. After you met with Abel and Tara Otero at dinner where the will was discussed, and a week later when you e-mailed them to Tara Otero, did you communicate your involvement in the preparation of the will and the durable power of attorney to anyone at Liberty?

A. No.

Q. Why not?

A. Because I had spoken --

MS. PULLEN: Excuse me. Let me just do a form, foundation.

A. Because I had previously spoken with Mr. McDonough and I believed that this fell within what we had discussed.

---

45

Q. (BY MS. ALLEN) So you had assumed that because Mr. McDonough had given you permission to pursue or help your sister, you thought that the same permission applied to you undertaking the preparation of the will and the power of attorney with regard to Jimmy Otero, Junior?

MS. PULLEN: Objection; form and foundation.

Q. (BY MS. ALLEN) Is that correct?

MS. PULLEN: Objection; form and foundation.

A. Because Mr. McDonough had said family or people I regarded as family, I thought assisting Abel was no different than assisting my sister; that is correct.

Q. (BY MS. ALLEN) Okay. And that's the reason why you did not speak to either Mr. McDonough or Ms. Leonard regarding your involvement with preparing the will and the durable power of attorney?

A. That's correct.

Q. Okay. Did you review the declaratory judgment action prepared by our office on behalf of Ironshore?

A. No.

Q. Do you recall signing an outside law practice agreement when you began your employment at Liberty?

A. Yes.

Q. I'm going to share my screen with you and we can mark this as Exhibit A to your deposition.

(Exhibit A marked.)

---

Trambley's Court Reporting

strambley@windstream.net

(505) 292-2120

EXHIBIT C

Ironshore Specialty Insurance v. Ulibarri

Daniel Ulibarri
October 15, 2024

---

**46**

Q. (BY MS. ALLEN) Can you see my screen, Mr. Ulibarri?

A. I can.

Q. And do you see this document says, "RE: Outside Law Practice" and then below it it says, "Outside Practice Agreement"?

A. Correct.

Q. And there is a signature and an office number/office name and a department number and name. Do you see that?

A. I do.

Q. Do you recognize the signature on this document?

A. Yes.

Q. Whose signature is it?

A. That is my signature.

Q. Okay. And do you recognize the office number/name?

A. I do not.

Q. Okay. Do you recognize the department number and name?

A. The department name, the department number, I -- I don't recall, honestly.

Q. But the department name is identified as "Legal." Do you see that?

A. Right, and that, I do recall. We were part of the

---

**47**

legal department.

Q. Okay. All right. I'm going to scroll up to the Outside Law Practice Agreement. You were a salaried employee at Liberty; is that correct?

A. Yes.

Q. Okay. It begins with, "Salaried Liberty Mutual Insurance attorneys employed in any of our Field offices, may not engage in the practice of law other than the work incident to their employment with the Company." Did I read that correctly?

A. Yes.

Q. Did you understand this document at the time you signed it that you could not engage in the practice of law other than work incident to your employment subject to a few exceptions?

A. Sure.

Q. Okay. Now, Subpart A says, "The only exceptions to the rule are as follows: 1, Handling the personal (not commercial) legal affairs of family members (parents, siblings, spouse and children)." Did I read that right?

A. Correct.

Q. Okay. Were the Oteros either parents, siblings, spouse, or children?

A. No.

Q. Part 2, under Subpart A says, "Handling legal

---

**48**

matters for Liberty Mutual employees, but only after written communication to the General Attorney describing the matter and receipt of written consent." Did I read that right?

A. Yes.

Q. Okay. And the Oteros were not Liberty Mutual employees; am I correct?

A. That is correct.

Q. Okay. Then we move on to Subpart B, which says, "The following will not be considered the private practice of law for the purpose of this memorandum. Number 1, the handling of a modest amount of pro bono publico work by assignment from an agency sponsored by the State, its court system or a bar association, but only with the permission of the Regional General Attorney or the General Attorney following a satisfactory showing that errors and omissions coverage is furnished by such agency." Did I read that right?

A. Yes.

Q. Okay. And the matter involving the Oteros does not fall into B1; is that correct?

MS. PULLEN: Objection to form, foundation.

Q. (BY MS. ALLEN) Would you agree with that?

MS. PULLEN: Objection to form.

Q. (BY MS. ALLEN) Mr. Ulibarri?

A. It -- it's a question of the phrasing of the

---

**49**

question, Ms. Allen, does it fall within that. Depending on circumstance, it certainly could fall within that.

Q. Okay. Well, let's break it down, then. Were you -- was the drafting of the will and the durable power of attorney an assignment from an agency sponsored by the State, its court system, or a bar association?

A. No.

Q. Okay. So would you agree that drafting the will and the durable power of attorney does not fall within the exception by B1?

MS. PULLEN: Objection; form, foundation, calls for a legal opinion that my client is not going to offer on these subjects. Ms. -- Meena, I think you're unfairly asking him to make a conclusion that is reserved for the Court in this matter.

MS. ALLEN: Please -- please -- I would appreciate if you could object to form, foundation, and I'm not asking him as an expert or a legal conclusion, I'm asking his understanding as a lay witness who signed the document, that's all.

Q. (BY MS. ALLEN) Mr. Ulibarri, having said that, I'm just asking your understanding when you signed the document. Would you agree that since drafting the will and the durable power of attorney is not an assignment that you received from an agency sponsored by the State, its court

---

13 (Pages 46 to 49)

Ironshore Specialty Insurance v. Ulibarri

Daniel Ulibarri
October 15, 2024

---

**50**

system, or a bar association -- would you agree with that?

A. Yes.

Q. Okay. Let's go on to B2, "Acting an as arbitrator" -- sorry; I stopped my screen share. Give me one second. B2 says, "Acting as an arbitrator within the Court system or in workers' compensation and insurance industry proceedings." Did I read that right?

A. Yes.

Q. Okay. And you would agree that drafting the will and the durable power of attorney was not an assignment to you as an arbitrator within the Court system or in workers' compensation and insurance industry proceedings?

A. Correct.

Q. Okay. And just above your signature, there is a sentence that states, "I understand violations of this rule will result in disciplinary action including termination for cause without probation and without two weeks separation notice." Did I read that right?

A. Correct.

Q. When did you notify Liberty Mutual that you had prepared a will and a durable power of attorney for Jimmy Otero, Junior?

MS. PULLEN: Objection to form and foundation.

A. When the State court case was filed.

Q. (BY MS. ALLEN) Do you recall what year it was

---

**51**

filed?

A. I do not.

Q. Okay. Was that when you had made a request for a defense?

A. Yes.

Q. Before you made a claim for defense after the State court matter was filed, did you or were you involved in responding to any queries or questions by counsel in the State court matter regarding your involvement in preparing the will and the durable power of attorney?

A. The State court matter wasn't pending prior to that time, so no.

Q. I understand that. But before the State court matter was filed, were you involved in assisting or helping the family or counsel for the family with regard to your involvement in preparing the will and the durable power of attorney? Did you understand the question?

A. I was not assisting the family or counsel for the family in any way prior to the State court action being filed.

Q. Okay. So when the State court action was filed, that was your first notice that some of the family members had filed a lawsuit against you?

A. Correct.

Q. And prior to that, you had no inkling that what

---

**52**

you had done in 2018 was ever at issue?

MS. PULLEN: Objection to form.

Q. (BY MS. ALLEN) Let me rephrase the question. That was a bad question. So before the lawsuit was filed, you had no idea that the will and the power of attorney that you had created was an issue?

MS. PULLEN: Objection; form.

A. Before the State court action was filed and served, I didn't know that there were complaints about what had transpired, if that's where we're going.

Q. (BY MS. ALLEN) Okay. At the time that the original lawsuit was filed, who was your employer?

A. At the time the State court lawsuit was filed --

Q. Yes.

A. -- I was employed with Fred Loya.

Q. Did you ever make a claim under -- strike that. Did you ever make a claim to Fred Loya to defend you in the State court matter?

A. I notified Rick Chavez; at the time it was Chavez Legal Group that was the in-house provider of legal services. Mr. Chavez referred the matter to the carrier, is my understanding. I was informed that there would be no coverage.

Q. Who informed you that there would be no coverage?

A. Mr. Chavez.

---

**53**

Q. Did you receive any type of written documentation that there was no coverage?

A. I did not.

Q. Do you remember the name of the insurer?

A. I do not.

Q. Do you know if Loya had an insurance policy?

A. I believe that they did and they do.

Q. Okay. But you don't know the name of the insurance policy; is that correct?

A. I do not.

Q. Did you ever make a claim with your homeowner's insurance with regard to the State court lawsuit?

A. Not that I recall.

Q. Who was your homeowner's policy -- strike that. Who was your home -- what is the name of your homeowner's insurer at the present time?

A. Travelers.

Q. Who was your homeowner's insurer back in 2022?

A. Travelers.

Q. Besides presenting the claim to Liberty and to Loya, did you ever make a claim for defense under any other policy?

A. No, not that I recall.

MS. ALLEN: Why don't we take a five-minute break.

MS. PULLEN: That's fine.

---

Trambley's Court Reporting

strambley@windstream.net

(505) 292-2120

Ironshore Specialty Insurance v. Ulibarri

Daniel Ulibarri
October 15, 2024

**62**

requirements.

A. Correct.

Q. Did you review that and mark that as a "Yes"?

A. Yes, I would have.

Q. And Question Number 2, "Have you complied with the Company's Privacy compliance requirements during the past year or since your employment at Liberty?" And that question is marked with a "Yes." And do you believe you complied with the Company's Privacy compliance requirements when you marked that with a "Yes"?

A. I do believe I complied with the company's privacy compliance requirements, yes.

Q. And, again, scrolling to Number 4, which is similar to what I read out earlier so I won't read out again for the record, but please take a minute to read it or whatever time you need to read it, but this question is similar to what we previously read, and it's marked with a "No." Do you see that?

A. That's correct.

Q. Okay. And, again, you did not identify your work in relation to preparing the will or the durable power of attorney for Jimmy Otero, Junior, here; am I correct?

MS. PULLEN: Objection to form.

A. Not that I recall.

Q. (BY MS. ALLEN) Okay. And scrolling to Question

**63**

Number 12, again, it asks for, much like the 2018 form, whether you had any relationship or participated in outside work, which in your judgment, may not be in conflict with the company, but may create the appearance of a conflict, and you marked it as "No." Do you see that?

A. I see that it's marked as "No" on this paper, yes.

Q. Okay. And you did not identify or disclose your work in preparing the will and the durable power of attorney for Jimmy Otero, Junior, here; am I correct?

MS. PULLEN: Objection to form.

A. Not that I recall.

Q. (BY MS. ALLEN) Okay. Why didn't you identify and disclose the work that you had done for Abel or Tara Otero or Jimmy Otero, Junior, here?

A. I wouldn't have disclosed it in 2019 because it wasn't work done in 2019. I wouldn't have disclosed it because it wasn't work in conflict with my work and it wasn't work which would have created the appearance of a conflict and I wouldn't have ever disclosed it in the financial certification context because there was no financial interest of any kind.

Q. Okay. So you did not disclose that in either 2018 or 2019 because you didn't believe that there was either an actual conflict or the appearance of a conflict; is that fair?

**64**

MS. PULLEN: Objection to form.

A. I would not have disclosed it because there was not a conflict and I did not believe there was any appearance of conflict. If I --

Q. (BY MS. ALLEN) And you did not otherwise -- I'm sorry; go ahead.

A. If I had been asked. I didn't believe I was being asked those questions when I completed the highly compensated form.

Q. When you say "highly compensated form," you're talking about the conflict of interest forms, right, that we just went through and identified as Exhibit B?

A. Correct.

Q. Okay. And you did not notify either Ms. Leonard, Ms. Skrabo, or Mr. McDonough of your involvement in preparing the will and durable power of attorney for Jimmy Otero, Junior, at the request of Tara and Abel Otero; am I correct?

MS. PULLEN: Objection; form, foundation.

A. I did not discuss what I had done for Abel with Kathryn, Rick, or Susan -- Suzana.

Q. (BY MS. ALLEN) And when you say "Rick," is that a short form for Patrick McDonough?

A. Mr. McDonough went by "Rick," yes.

Q. Okay. All right. I just wanted to make sure to

**65**

keep the record clear. Sorry; I'm going through my notes very quickly.

Did you provide any recorded statements or statements to either Liberty Mutual Group, Inc., or Ironshore in relation to the State court litigation?

A. No.

Q. What training did you receive from Liberty with regard to performing work that was not assigned by Liberty Mutual?

A. I don't understand the question.

Q. Sure. Did you receive any training from Liberty Mutual regarding accepting work that was not assigned by Liberty Mutual?

A. Not that I recall.

Q. How did you know to contact Mr. McDonough when your sister asked you to represent her in that employment-related matter?

A. Ms. Leonard referred me to him.

Q. How did you know to contact Ms. Leonard first before you started representing your sister?

A. Because she was my immediate supervisor.

Q. Did you feel that you had to get her permission before you started representing your sister?

A. Yes.

Q. Because that was work that was not related to any

17 (Pages 62 to 65)