**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

IRONSHORE SPECIALTY INSURANCE
COMPANY,

      Plaintiff,

v.                                       No. 1:23-cv-00881-MLG-JFR

DANIEL ULIBARRI,

      Defendant.

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

While employed by Liberty Mutual Group Inc. ("Liberty"), Defendant Daniel Ulibarri prepared estate documents for the father of a close friend. He was later sued for malpractice. Ulibarri requested a defense and indemnification pursuant to a professional liability policy issued by Plaintiff Ironshore Specialty Insurance Company ("Ironshore") to Liberty. Ironshore denies it is obligated to provide either, and the dispute is now before the Court. The dispositive question is whether Ulibarri was acting on Liberty's behalf when he drafted the documents. The Court concludes that he was not and that Ironshore is therefore entitled to summary judgment.

**RELEVANT FACTS AND PROCEDURAL HISTORY[1]**

Liberty provides legal services to "Liberty Mutual Insurance member companies and their insureds with respect to various insurance-related matters, such as motor-vehicle tort claims[.]" Doc. 49 at 7 ¶ 11. Ulibarri served as Liberty's field legal counsel from 2015 to 2019. *Id.* ¶ 10. At the outset of his employment, Ulibarri signed an agreement limiting the scope of his law practice. Doc. 1-2 ("Outside Practice Agreement" or "Agreement"). Specifically, the Outside Practice

---

[1] The Court takes the following from the parties' undisputed material facts and exhibits.

Agreement prohibited salaried Liberty attorneys (such as Ulibarri) from "engag[ing] in the practice of law other than the work incident to their employment with the Company." *Id.* Per the Agreement, "the private practice of law" does not include:

1.    The handling of a modest amount of *pro bono publico* work by assignment from an agency sponsored by the state, its court system or a bar association, but only with the permission of the Regional General Attorney or the General Attorney following a satisfactory showing that errors and omissions coverage is furnished by such agency.

2.    Acting as an arbitrator within the court system or in workers' compensation and insurance industry proceedings.

*Id.* The Agreement also contains two express exceptions to the general rule prohibiting outside work:

1.    Handling the personal (not commercial) legal affairs of family members (parents, siblings, spouse and children).

2.    Handling legal matters for Liberty Mutual employees but only after written communication to the General Attorney describing the matter and receipt of written consent.

*Id.* Thus, any legal work performed by Ulibarri outside his role at Liberty was permissible only if it did not qualify as "the practice of law" and fell within these narrowly defined exceptions.

While in Liberty's employ, and at the request of his close friend Abel Otero, Ulibarri drafted a will and power of attorney for Abel's father, Jimmie Otero, Jr.[2] Doc. 49 at 8 ¶ 16; Doc. 50-1 ¶ 5. Jimmie executed both documents before his death in July 2018. Doc. 49 at 6-7 ¶¶ 5, 8. Several years later, members of the Otero family sued Ulibarri in state court ("Otero Suit"), claiming he wrongfully prepared the documents and conspired to disinherit some of Jimmie's relatives. *Id.* ¶¶ 4, 6, 8-9.

---

[2] The Court uses first names to avoid confusion given the Oteros' shared last name.

Ironshore is Liberty's malpractice carrier. It issued the professional liability insurance policy ("Policy") that was in effect when Ulibarri drafted Jimmie's estate documents. *Id.* at 5 ¶ 1; Doc. 49-1 at 1. Ulibarri invoked the Policy and demanded that Ironshore defend him in the Otero Suit. Doc. 49 at 8-9 ¶¶ 20-21. Ironshore agreed to provide a defense under a reservation of rights. *Id.* ¶ 21. It subsequently initiated this litigation to resolve its obligations to Ulibarri under the Policy.

Ironshore's Motion for Summary Judgment ("Motion") is now before the Court. Doc. 49. It asserts that, as a matter of law, Ulibarri does not qualify as an "Insured" under the terms of the Policy.[3] *See* Doc. 49 at 3. Ulibarri argues otherwise. He claims that he was an "Insured" and was acting on behalf of Liberty when drafting the estate documents. *See generally* Doc. 50. For the reasons set out below, the Court rejects that argument and finds that Ironshore's Motion should be granted.

## APPLICABLE LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). It is a drastic remedy and should not be granted improvidently. *McGill v. Am. Land & Expl. Co.*, 776 F.2d 923, 926 n.5

---

[3] Ironshore's claim is brought under 28 U.S.C. § 2201, the Federal Declaratory Judgment Act ("DJA"). Jurisdiction under that act is discretionary, and "a district court 'may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'" *United Fin. Cas. Co. v. Rocha*, 726 F. Supp. 3d 1295, 1302 (D.N.M. 2023) (quoting § 2201(a)) (emphasis omitted). Ulibarri has not raised any challenge to the Court's exercise of its discretionary jurisdiction to decide this matter. Nor does Ulibarri argue that Ironshore lacks standing to bring its claim for declaratory relief under the DJA. *See id.* at 1301 ("[T]the party seeking a declaratory judgment must demonstrate that it has met the predicate case-or-controversy requirements of Article III standing." (citing *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1241 (10th Cir. 2008))). The Court independently concludes that Ironshore has standing. *See id.* (collecting cases that have ruled an insurance company has standing to bring a DJA action to determine its obligations to defend and indemnify).

(10th Cir. 1985) ("We reiterate the teachings of our past cases that summary judgment is a drastic remedy that should be granted only with caution." (citing *Redhouse v. Quality Ford Sales, Inc.*, 511 F.2d 230, 234 (10th Cir. 1975))). "When assessing a summary judgment motion, the Court examines the factual record and draws all reasonable inferences in the light most favorable to the nonmoving party." *StoneX Commodity Sols. LLC v. Bunkley*, No. 1:23-cv-00735-MLG-LF, 2024 U.S. Dist. LEXIS 144111, at *4 (D.N.M. Aug. 12, 2024) (citing *EFLO Energy v. Devon Energy Corp.*, 66 F. 4th 775, 787 (10th Cir. 2023)). "The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, but once the moving party has done so, the burden shifts to the non-movant to establish a genuine issue of fact." *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1197 (10th Cir. 2022). Assuming that hurdle is cleared, the nonmovant must either provide cites to the record or, in the alternative, demonstrate the moving party's proffered contentions do not resolve a material factual dispute. *See Mayer Botz Enters. LLC v. Cent. Mut. Ins. Co.*, 720 F. Supp. 3d 1081, 1082 (D.N.M. 2024).

Insurance coverage disputes are not excepted from Rule 56. The interpretation of "insurance policies and determining policy rights and obligations 'are questions of law, appropriate grist for the summary judgment mill.'" *Alps Prop. & Cas. Ins. Co. v. Westerfield*, No. 1:22-cv-00440-MLG-JFR, 2024 U.S. Dist. LEXIS 74229, at *5-6 (D.N.M. Mar. 19, 2024) (quoting *Merchs. Ins. Co. of N.H., Inc. v. U.S. Fid. & Guar. Co.*, 143 F.3d 5, 8 (1st Cir. 1998)); *see also United Nuclear Corp. v. Allstate Ins. Co.*, 2012-NMSC-032, ¶ 9, 285 P.3d 644, 647 (providing that "the interpretation of terms within an insurance policy" is a question of law that can be properly decided at the summary judgment stage) (citing *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 60, 123 N.M. 752, 945 P.2d 970). When facts are undisputed, and the sole issue is the application of an insurance policy, the matter is a question of law for the court. *See Benns v. Cont'l Cas. Co.*, 982

F.2d 461, 462 (10th Cir. 1993); *Martinez v. Allstate Ins. Co.*, 1997-NMCA-100, ¶ 5, 124 N.M. 36, 37, 946 P.2d 240 ("If the facts are undisputed and only a legal interpretation of the facts remains, summary judgment is the appropriate remedy." (internal quotation marks omitted) (quoting *Garrity v. Overland Sheepskin Co. of Taos*, 1996-NMSC-032, ¶ 29, 121 N.M. 710, 917 P.2d 1382, 1390)).[4]

## DISCUSSION

Per the Policy, Ironshore agreed to pay "on behalf of the Insured all sums that the Insured becomes legally obligated to pay as Damages and Claims Expenses resulting from Claims . . . made against the Insured . . . as a result of a Wrongful Act by the Insured or any Entity for whom the Insured is legally liable[.]" Doc. 49-1 at 2 (emphases omitted). The Policy defines an Insured as "[a]ny person who is . . . [an] employee of [Liberty]" but only when that person is "acting on behalf of [Liberty], and only to the extent [Liberty] agrees to provide professional liability insurance for that person[.]" *Id.* at 4. That proviso is at the center of the parties' dispute.[5]

Ironshore notes that Liberty did not direct Ulibarri to draft Jimmie's estate documents; the drafting was performed at Abel's request; Liberty was not aware of Ulibarri's actions until the Otero Suit was filed; and that the legal task did not fall within an exception to Liberty's Outside

---

[4] Because this is a diversity case, New Mexico substantive law applies. *See, e.g., Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988) ("In a diversity action, the federal courts are required to apply the law of the forum state." (citation omitted)). Further, the parties implicitly agree that New Mexico law governs the interpretation of the Policy. *See* Doc. 49 at 9-10; Doc. 50 at 6-7; Doc. 54 at 10-11. The Court proceeds accordingly. *See Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1250 (10th Cir. 2020) (assuming, based on the parties' agreement, that New Mexico law applied to a contractual dispute); *cf. Wood v. Mid-Valley Inc.*, 942 F.2d 425, 427 (7th Cir. 1991) (commenting that with the exception of subject-matter jurisdiction, federal "courts are not required to and ordinarily do not create issues where the parties agree . . . [and they] do not worry about conflict of laws unless the parties disagree on which state's law applies").

[5] The Court scheduled this matter for an in-person hearing to better understand the parties' positions. Ulibarri's counsel did not appear for that proceeding. *See* Doc. 57.

Practice Agreement. Doc. 49 at 10; Doc. 54 at 5-12. Based on these facts, Ironshore contends, Ulibarri was not an Insured, and it should be relieved of any legal obligation to defend or indemnify Ulibarri in the Otero Suit. Doc. 49 at 9-11. Ulibarri sees it differently. He argues that his "alleged acts of malpractice were a permitted unpaid, pro bono project that his employer, Liberty Mutual Group, and his supervisors, allowed." *See* Doc. 50 at 1, 6-9. Ulibarri reasons that he is therefore an Insured under the Policy and should receive the attendant benefits provided by that contract. *Id.* at 5. Accordingly, to decide the pending motion, the Court must first resolve the parties' disagreement over the meaning of "on behalf of" as used in the Policy's definition of "Insured."[6] *See* Doc. 49-1 at 4.

In considering the matter, the Court begins by "giv[ing] force and effect to the intent of the parties." *Medina v. Sunstate Realty, Inc.*, 1995-NMSC-002, ¶ 8, 119 N.M. 136, 889 P.2d 171 (citation omitted). "When the parties' expressions of mutual assent are clear and unambiguous, [courts] must give effect to those expressions." *Id*. That legal maxim applies to definitional terms and other contractual language. *See ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, ¶ 23, 299 P.3d 844 ("The purpose, meaning and intent of the parties to a contract is to be deduced from the language employed by them; and where such language is not ambiguous, it is conclusive." (internal quotation marks omitted) (quoting *Con't Potash, Inc. v. Freeport–McMoran, Inc.*, 1993-NMSC-039, ¶ 54, 115 N.M. 690, 858 P.2d 66)). But when material terms are undefined, the fundamental canon of construction is applied: relevant language is understood through the context of its "'usual, ordinary, and popular' meaning, such as found in a dictionary." *United Nuclear Corp.*, 2012-NMSC-032, ¶ 19 (citation omitted) (quoting *Battishill v. Farmers All. Ins. Co.*, 2006-NMSC-004, ¶ 8, 139 N.M. 24, 127 P.3d 1111).

---

[6] The Policy does not define the phrase. *See generally* Doc. 49-1.

The phrase "on behalf of" is commonly understood to mean "in the name of, on the part of, [or] as the agent or representative of." *Behalf*, Black's Law Dictionary (12th ed. 2024) (internal quotation marks omitted); *accord Behalf*, Oxford English Dictionary (Mar. 2026), https://doi.org/10.1093/OED/7100761689 [https://perma.cc/V2LL-6BA3] (defining "on behalf of" as "[i]n the name of a person, organization, etc.; as the agent or representative of; for"). In modern usage, the phrase is sometimes understood more broadly and may signify "actions taken 'in the interest or for the benefit of' another, even if those actions were not performed by an 'agent or representative.'" *A.B. ex rel. J.B. v. Barrow*, 163 F.4th 1336, 1342 (11th Cir. 2026) (quoting *Behalf*, Black's Law Dictionary (12th ed. 2024)); *see also Behalf*, Black's Law Dictionary (12th ed. 2024) (explaining that "*In behalf of* means 'in the interest or for the benefit of'" while "*on behalf of* means 'as the agent or representative of'" but acknowledging that "in current usage, the distinction is seldom followed" (citation modified)).[7] Either way, the phrase connotes conduct that is undertaken for the advantage of another—whether through a formal agency relationship or otherwise.

Here, it is undisputed that Liberty "operates a law firm whose attorneys represent *only* Liberty Mutual Insurance member companies and their insureds with respect to various insurance-related matters, such as motor-vehicle tort claims, which are unrelated to estate planning." Doc. 49 at 7 ¶ 11 (emphasis added). It is also undisputed that Ulibarri was precluded from taking on outside clients and that Liberty did not assign Ulibarri to work for Abel. Doc. 49 at 8 ¶¶ 15-17; Doc. 49-2 at 2 (30:3-6, 32:9-21); Doc. 50 at 3-4; Doc. 49-3 at 4 (30:2-12). Moreover, Ulibarri

---

[7] Although the terms are not directly part of the dispute, for completeness, the Court notes that "benefit" is defined as "[t]he advantage or privilege something gives; the helpful or useful effect something has" or "[p]rofit or gain." *Benefit*, Black's Law Dictionary (12th ed. 2024). And "interest" is "[t]he object of any human desire; esp[ecially], advantage or profit of a financial nature." *Interest*, Black's Law Dictionary (12th ed. 2024).

concedes that Abel was his client when he drafted Jimmie's will and power of attorney. Doc. 49-2 at 2 (30:3-14). Taken together, these uncontested facts demonstrate that Ulibarri acted on behalf of his client, Abel, not Liberty, when he drafted the will and power of attorney. *See generally* Rule 16-103 NMRA comm. cmt. 1 ("A lawyer must . . . act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf."); *Marchman v. NCNB Tex. Nat. Bank*, 1995-NMSC-041, ¶¶ 55-56, 120 N.M. 74, 898 P.2d 709 (explaining that an attorney is their client's agent).

Notwithstanding the foregoing, Ulibarri argues that "[t]he reasonable insured . . . would . . . expect the term to include malpractice protection for pro bono services *allowed* by his employer." Doc. 50 at 7 (emphasis added). Ulibarri does not provide a reasoned legal argument as to why "on behalf of" should be construed differently than its modern, common meaning. His conclusory assertion that drafting the estate planning documents for Abel "was *acting on behalf of* Liberty Mutual Group because he was *permitted* to engage in [that activity] while working for Liberty" is inconsistent with the ordinary understanding of these words and therefore fails as a matter of law.[8] *Id.* at 6 (emphases added). So, Ulibarri's work for Abel was not transformed into an action undertaken on behalf of Liberty just because Ulibarri's supervisor told him that he was permitted to perform legal tasks for "someone [he] considered family" under the Outside Practice

---

[8] Ulibarri suggests the language creates an ambiguity in the policy language. It is well established, however, that "'an ambiguity does not exist merely because the parties hold competing interpretations' about the meaning of a policy provision." *United Nuclear Corp.*, 2012-NMSC-032, ¶ 10 (quoting *City of Santa Rosa v. Twin City Fire Ins. Co.*, 2006-NMCA-118, ¶ 7, 140 N.M. 434, 143 P.3d 196). Ulibarri's proposed meaning of the term is strained and lacks any legal or factual argument supporting its adoption. *See Safeco Ins. Co. of Am. v. McKenna*, 1977-NMSC-053, ¶ 20, 90 N.M. 516, 565 P.2d 1033 ("Resort will not be made to a strained construction for the purpose of creating an ambiguity when no ambiguity in fact exists." (citations omitted)).

Agreement. Doc. 50-1 at 1 ¶ 3. Ulibarri does not present any evidence that work allowed by the Outside Practice Agreement would be covered by the Policy on an independent basis.[9]

Ulibarri's additional arguments concerning his law license do not impact the outcome. For example, he notes the New Mexico Supreme Court's encouragement of "pro bono work . . . as a matter of professional responsibility." Doc. 50-1 at 1 ¶ 4 (citing Rule 24-108 NMRA). He also points out that New Mexico State Court Rules 24-102(B)(2)(b) and 16-104(C)(7) require that he maintain malpractice insurance in order to remain licensed as an attorney in New Mexico. Doc. 50-1 at 1-2 ¶¶ 6-7. While these provisions outline Ulibarri's general professional obligations, they do not establish that he was acting to benefit Liberty or advance Liberty's interests when he completed legal tasks for Abel. To the contrary, the undisputed facts demonstrate that Ulibarri was acting "on behalf of" Abel by taking him on as a client and drafting legal documents for him at no cost. Doc. 49 at 8 ¶¶ 15-17; Doc. 49-2 at 2 (30:3-6, 32:9-21); Doc. 50-1 at 1 ¶ 5; Doc. 54 at 4. And although these deficiencies are dispositive, for completeness, the Court briefly addresses Ulibarri's remaining contentions.

Starting with Ulibarri's pro bono service claim, an attorney may satisfy their professional responsibility obligations in various ways, including by providing "pro bono services to the poor," donating to "organizations that provide legal services to persons of limited means in New Mexico," or by "participat[ing] in activities for improving the law, the legal system or the legal profession." Rule 24-108 NMRA; Rule 16-601(C) NMRA. But there is nothing in the record to suggest that Abel was poor or that Ulibarri was seeking to fulfill his pro bono obligations. *See Mayer Botz*

---

[9] Ulibarri contends that Liberty "never said that the permitted pro bono projects would not be covered by the [Policy]." Doc. 50 at 8. He does not suggest, however, that Liberty told him that the Policy *would* cover work he performed for Abel. Nor does he argue that he detrimentally relied on such a representation. *See generally* Doc. 50.

*Enters. LLC*, 720 F. Supp. 3d at 1082 (providing that "it is incumbent on a party challenging a party's request for summary judgment to proffer *some* evidence—deposition testimony, documents, or otherwise—that creates a triable question"). Rather, the evidence before the Court indicates Ulibarri was simply doing a friend a favor. Doc. 50-1 at 1 ¶ 5 (affirming that Ulibarri considered Abel "like family" and that Ulibarri drafted the estate documents "without charge . . . to help Abel").

Ulibarri's reliance on New Mexico's rules addressing malpractice insurance is similarly misplaced. Neither Rule 24-102(B)(2)(b) nor 16-104(C)(7) requires an attorney to carry malpractice insurance. Rather, the rules require only that an attorney disclose whether they maintain coverage meeting specified limits. *See* Rule 16-104(C)(1), (7) NMRA; *see also* Rule 24-102(B)(2)(b) NMRA (requiring that attorneys annually complete the "professional liability insurance certification required by Rule 16-104(C)(7) NMRA"). Thus, Ulibarri's suggestion that the Policy necessarily covered his work for Abel (drafting Jimmie's estate documents) because he could not practice law without professional liability insurance is incorrect.

## CONCLUSION

Ulibarri was not acting on behalf of Liberty when he performed legal work for Abel. Accordingly, Ironshore does not have a duty to defend or indemnify Ulibarri in the Otero Suit because Ulibarri was not an Insured under the Policy when he drafted Jimmie's estate documents. Ironshore's Motion, Doc. 49, is granted. A final judgment pursuant to Federal Rule of Civil Procedure 58(a) will be entered separately.

It is so ordered.

_____
UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA